At this time we'll hear Babbini v. Gesualdi. Thank you. Thank you. I didn't think he was alive, did he? May I please the court, your honors? My name is Gerald Dandino. I represent the appellant in the underlying appeal. As your honors are aware that this is a regarding ERISA and the revocation of my client's pension annuity benefits and contributions and the suspension of his welfare coverage based upon what we consider to be a clear error on the part of the trustees when they rendered their decision to revoke his benefits and his welfare coverage. Your honor, this case stems from what actually occurred in a 2011 case which was also decided by Judge Spatt. When Judge Spatt granted summary judgment to the respective funds who were defendants in this case that my client and his company which was Coral and his mother's company which was Oakfield Leasing constituted a joint employer and as a result they obtained the funds as plaintiffs obtained a judgment for unpaid contributions for Coral's men who were also 282 members and assessed a judgment against them. The judgment was never satisfied and in 2014 the trustees based upon what we consider to be very very scant evidence which was a undated letter from a Michael from a Mr. Bassolino together with other Coral drivers stated that while he was a barn steward for Oakfield he never saw my client drive a truck. Now Mr. Bassolino and the other signatories to this letter were also plaintiffs simultaneously in an FLSA case against . . . Did that disqualify them as witnesses? Is this evidence inappropriate or it's just a question of weight? I think it was a question of weight and bias, your honor. But . . . So what do we do with it? Well, your honor, that goes to the overall picture as to whether or not summary judgment should be The most telling element of clear error by Judge Spak was when he stated at page was page 2181 of the record, quote, here the evidence shows that the plaintiff incorrectly received credit for the hours he claimed to have worked at Oakfield. Now the trustees went back and revoked 17 years of pension credits and annuity contributions. 17 years that had already been given to my client a credit to the plaintiff. Well, if he had defrauded them, the fact that he got them doesn't mean that he's entitled to keep them, does it? Your honor . . . Just answer that question. If indeed he had defrauded them, if this was truly a fraud, not whether he did or he didn't, but I'm giving you a hypothetical, if he indeed did defraud them, made false representations as to the hours he worked, were the trustees powerless to take his credits away? Your honor, first of all, I don't think that under the vesting standards of both the pension and the annuity fund, okay, fraud would have constituted a basis to revoke his pension. So you're telling me that Congress enacted a statute that says that as an employee, if I defraud my employer with regard to the credits I'm entitled to for my retirement, that the employer has no remedy against me? No, your honor, Congress . . . That's a stunning . . . No, look, Congress said that if there was fraud, okay, that involves the fund itself by the participant, then that may Well, again, I think we're jumping ahead of ourselves because there was no proof of any fraud. But there is proof of fraud. He paid his employees in cash. That is a fraud on the welfare fund. Your honor, you are correct. Well, again . . . But there is proof of fraud. There was an allegation of fraud that for a period of time, a very, very short period of time, that several of these employees who were also 282 members received their wages in cash. From that, both the trustees and the lower court extrapolated that for the prior 17 years, regardless of all of the steward reports, which are documents kept by the union . . . It says in cases of fraud, the welfare plan says in cases of fraud or intentional misrepresentations, that's what it is to pay in cash, your coverage may be rescinded retroactively upon 30 days' notice. Now, all those 17 years, he got coverage for his health coverage, I suppose. But, your honor, there was no proof . . . That's why they took it back from the prior 17 years. There was no proof of any nature whatsoever that for the years preceding Mr. Basilino's . . . It's retroactive. It's rescinded retroactively, but that doesn't mean he has to pay back what he got in the way of health benefits. First of all, your honor, the section you just read from was from the welfare fund. Judge Spad ruled that . . . The welfare fund. That's what I'm talking about. Right. Judge Spad ruled that in the underlying case, the trustees did not allege for the purpose of revocation of the pension and annuity credits, fraud. They simply said . . . I'm not talking about the pension. There are two plans here.  I'm talking about the welfare fund. Even if there were four. I'm talking about the welfare fund. Right. Okay. It was fraud. You said there was no fraud, but there is. The language in the welfare fund, the plan for fraud deals with when a participant of him a participant who committed fraud with other members, okay, of the fund by paying them cash. So if that were the case, then they all committed fraud. But they only accused my client. If he were an employer, though, which, again, depended upon which hat they want him to . . . It doesn't do you much good to say that several other people also should have been thrown off. But, Your Honor, if he was an employer, an employer of Coral. Coral was the employer of these men. If Coral paid those members cash for a small period of time . . . He ran Coral, right? Yes, he did. He owned it, and he ran it. He ran it. Yes. Okay. He paid the cash. He paid the cash. But that does not constitute the type of fraud which the welfare fund intended to be the basis for revocation of welfare coverage. Fraud is almost never cabined into particular little acts, because the mind of man can always think of new ways of committing fraud, and paying cash happens to be a rather primitive one. Yes, that is true. Okay, Your Honor. But again, you know, we are suggesting to the Court that the reading of the welfare plan document, okay, is limited to a participant's failure to report cash payments to the union, and is not covered by the set of circumstances. You know, Bobbino had . . . your client had an extraordinarily long period of time to produce all the documents to sustain his claims, and these are all after the fact. We are reviewing what they had in front of them, and your . . . his Johnny-come-lately revelations with regard to the fact that he actually was doing union work doesn't do anything to undercut the validity of the earlier decision. You had regular extensions, and it's only . . . excuse me. It's only after the fact that you finally produced the documents. Why should . . . what are we supposed to do? We're supposed to condone that? Your Honor, if I may . . . Isn't that the case? No, it's not the case, Your Honor. It's not the case? Because . . . Well, I'll take a look at the record, and you better hope that you're right. Because if Your Honor looks at the student reports, which are documents kept by members of the union, designated union representatives, going back to 1997, every student report documents the hours that my client drove a truck . . . Okay. . . . . . on a union job. I'll look for it. They are found at pages 600, 611. When were they timely admitted into evidence? Your Honor, they were . . . they were . . . well, there was never a question of evidence. They were part . . . we requested that they be part of the record. And they were, as Judge Spatz said, implicitly considered by the trustees as part of the record. But what they're doing then is that they are rejecting their own student reports. They are saying that every student report for this driver or for any driver was tainted by virtue of the biased allegation of Mr. Bassolino in 2012. You've reserved rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name is Svee Maxson of Cohen, Weiss & Simon LLP. We're counsel to the trustees of the local 282 Trust Funds, the defendant's appellees. Just to respond to a few of the things that appellant's counsel asserted, as far as the welfare fund's fraud definition, there are examples of fraud, but they are only examples. They, as you mentioned, Your Honor, don't cabin fraud in . . . fraud is fraud. And the trustees have the power to determine, to interpret the documents of all of the plans, including the welfare fund. And in this case, the trustees decided that the cash payments, which the appellant admitted to in a deposition, that those cash payments constituted fraud. And on de novo review, Judge Spat agreed with the trustees after looking at the welfare plan. Yes, Your Honor? No, go ahead. Second, as far as the question of what was in the record, there are, as you've seen from the briefs, two types of steward reports. There are the barn steward reports. The barn stewards are employees of the appellant, so within the control of the appellant. And so the reason the trustees decided that they couldn't trust the barn steward reports are that, first, they were under this individual's control, and second, one of the barn stewards, Mr. Bassolino, wrote to them and said, I was told to lie on my barn steward reports.  That is the same person, yes. And he had been a steward for a certain amount of time. Those are the records at 600 to 611? I would need to check, but I believe so, yes. These were in front of the trustees at the time of the determination? They were available to the trustees. They had been submitted to the union, and then the union submitted reports on those to the trustees. So the trustees had them available, but they had to discount them because they'd been told that they couldn't trust them. What did they seek that they could trust? They sought underlying records, which sections Could also be produced by employees of Mr. Babino? No, no. The underlying records would have been produced by Oakfield, by Mr. Babino's company. What you would call the driver tickets? Exactly. The driving tickets would have been in his possession. ERISA 209 requires an employer to hold on to those records. And were they ever produced? After the close of the administrative record. This is the thing I was referring to. I mean, they tried to get him to do it, and he said, mom's got them, and I don't have them. Well, he only produced them after the record closed. And he only produced 70. Out of how many, potentially? Well, there's one ticket a day, usually, and we're talking about 17 years' worth, or 17,000 hours. So not even a year's worth. A sprinkling of days over a three-year period. In addition, there are Would that have added up to the minimum amount that would credit him with a quarter or a year of service? I haven't done the analysis. It certainly wouldn't give him anywhere near the 17,000 hours that he's trying to get. Would it have been more typical to produce these documents contemporaneously in seeking benefits from the funds? Only if the funds have reason to doubt the remittance reports, usually. Other than that they rely on the reports. They don't ask for the tickets. But it's your view that they have to be retained even for 17 years? Yes. ERISA 209A makes that clear. And in addition- Retained forever? Until the employee applies for benefits. They need to be, there's no time limit under ERISA 209. Unlike Section 107 of ERISA, which is what the Appellants Council has been referring to in briefs. That sets a floor of six years. But since you might qualify for benefits or you might apply for benefits some decades after qualifying for them, it makes sense that there's no time limit. And that's what Judge Spapp agreed with. What do you say to arguments that these benefits or some of them were vested? Well, as you said, you can't vest in benefits that you don't have a right to. If you haven't performed covered work in the first place, both the annuity and the pension plans require enrollees, participants, to perform covered work. And if you haven't performed covered work, you can't qualify for the benefits in the first place. There's frequently a difference between what is required to deny somebody benefits or the accrual of benefits toward a vested position and what is required to divest somebody of a vested right. But there's no way to vest in a vested right if you haven't actually done what you need to do to vest in the first place. If becoming vested is a product of fraud, I can understand that. But at what point did he become vested? I understand your position is he never did, but let's assume he was pure. At what point would he have become vested? Had he performed covered work, he would have vested. The current rule is after five years of getting five vested credits. So it would be a certain amount in each year and then five years total. And it also depends on the contiguity of the years and a few other factors. But, again, that's neither here nor there because as far as the trustees are concerned, he never performed. He hasn't proven to their satisfaction that he even performed the covered work in the first place. So he never vested. As Judge Wesley pointed out, you can't defraud the funds into giving you a vested benefit in the first place. In addition, as far as the question of proof, the Appellant's Counsel mentioned that there were certain documents that the trustees relied on. As Judge Spat mentioned in his opinion, there's no rule of evidence for a benefit determination. The trustees received a letter from a particular former employee of the Appellant's and also received a statement from another former employee. They didn't rely only on those pieces of evidence, but this is on summary judgment. So the idea that they may or may not be credible because of who was making the statements doesn't matter at this point. Those were two pieces of evidence that the trustees had before them. Because he didn't get anything into the record in a timely way, there was nothing from the Appellant to counter those two pieces of evidence. I just want to point out one other thing about shop stewards. In addition to the barn stewards who are employees of the owner of the company, there are on-site stewards who are employees of a different company. And those on-site stewards did verify that the Appellant worked for a certain number of hours. And the trustees did give the Appellant credit for those hours that were verified by somebody not in his control. The Appellant restored his benefits and you made some repayments to him or you restored certain aspects of his benefits? Restored aspects of his benefits under the pension and annuity funds. The welfare fund is a different animal because it doesn't have those vesting provisions and he is banned for life from the welfare fund. Thank you. We'll hear rebuttal. Thank you, Your Honor. Your Honor, first of all, I'd like to clear up the fact that the steward reports, which were part of the record for the trustees that they disregarded, and, in fact, they said that they were tainted going back over 17 years. These steward reports are by far the very best evidence of the fact that my client was doing covered work for that entire period of time. There was never a question of any nature whatsoever, except for the two-year period that Mr. Basilino said he never observed him drive a truck out of the yard, that there was never a question that my client did not do covered work from 1997 to 2010. Your client was given the opportunity to confirm that the steward reports were correct by producing the driver tickets. Wait just a second. He got another extension, and then he got another extension, and he never produced the documents. And do you disagree that ERISA requires them to maintain, that the businesses were required to maintain those records? Absolutely, Your Honor. First of all, number one, who keeps records, even if you were an employer? I still have my tax returns from 1982. Well, you're a lot better than I am. Well, Your Honor, but who keeps, and again, assuming that my client was Oakfield for that period of time, which it was not because it was owned and rented. So come on. And then when he finally does, he produces 70 tickets. Come on. Your Honor, we relied, and we urged. It's one thing for you to come in here and to say, well, they couldn't believe, that we should issue a rule of law, that they had to believe these documents, when they've got an affidavit from somebody else who said, I was told to do something else. When he's given another opportunity to produce the documents, you say, well, who keeps documents? Come on. Your Honor. So what's the rule of law you want for us to say? Excuse me. That they had to accept these as a matter of law? Is that what you want? Your Honor, the rule of law is the best evidence. And the best evidence that my client was doing covered work. This is not the best evidence. The best evidence is the driver's tickets. Your Honor, going back 17 years, saying that an employer must keep records indefinitely of this type of nature. Not unconstitutional. But it is beyond what is required by ERISA. ERISA section 107 says, at a minimum, documents to prove an employer's benefits are to be kept at a minimum of six years. So did you produce six years worth of documents? No. Your Honor, we didn't have six years of documents. So you were in violation of ERISA? No. My client was not the employer, Your Honor. He was for a while. Oakfield was the employer. Oakfield was the one under ERISA. Who owned Oakfield? Dog ate my lunch. His mother. But his mother died. Your Honor. His mother died and then he owned it. No, no. His father owned it. His father owned it. My client never owned Oakfield. And in this industry, believe it or not, it is not uncommon for women to control trucking companies. One hopes so. Anyway, thank you. Thank you both. We'll reserve decision. The case of Banker v. Banker is taken on submission. The case of Galbraith v. Washington is taken on submission. That's the last case on calendar. Please adjourn court. Court is adjourned.